**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PHL VARIABLE INSURANCE COMPANY,   )
                                     )
          Plaintiff,   )
                                     )
         v.   )
                                     )
PRICE DAWE 2006 INSURANCE TRUST, by   )
and through its trustee, CHRISTIANA BANK   )
AND TRUST COMPANY, and PRICE DAWE   )
IRREVOCABLE LIFE INSURANCE TRUST,   )
by and through its trustee, CHRISTOPHER S.   )
HAMMATT,   )
                                     )
         Defendants.   )

REDACTED PUBLIC VERSION

C.A. No. 10-964-RGA

**PLAINTIFF PHL VARIABLE INSURANCE COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION TO EXCLUDE OPINIONS OF AND TESTIMONY BY
PRICE DAWE 2006 INSURANCE TRUST'S EXPERT STEVE BURGESS**

Richard D. Heins (I.D. #3000)
Tiffany Geyer Lydon (I.D. #3950)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
rheins@ashby-geddes.com
tlydon@ashby-geddes.com

Thomas F.A. Hetherington
Jarrett E. Ganer
Kendall J. Burr
EDISON, McDOWELL &
HETHERINGTON LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
(713) 337-5580

*Attorneys for Plaintiff
PHL Variable Insurance Company*

Dated:  January 22, 2013

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    BACKGROUND ................................................................................................2

          A.   Factual Background......................................................................... 2

          B.   Summary of Burgess's Alleged Expertise and Opinions ............................... 3

III.   LEGAL STANDARD......................................................................................4

IV.   ARGUMENT...................................................................................................5

          A.    Burgess States Opinions on Matters for Which He is Not a Qualified Expert ..... 5

          B.    Burgess's Opinions Are Not Reliable ................................................................ 7

             1. Burgess's Opinions Concerning Phoenix's Business Practices Lack Proper Factual Foundation, and He Fails to Employ Sound Methodology in Reaching His Conclusions................................................................................................. 7

             2. Burgess's Opinions Concerning the Legitimacy of the Insurance Transaction Lack Proper Factual Foundation, and He Fails to Employ Sound Methodology in Reaching His Conclusions ................................................................................. 12

          C.    Burgess's Opinions Do Not Assist the Trier of Fact........................................... 16

             1. Burgess's Phoenix's Business Practices Opinions Improperly Opine as to Phoenix's Analysis and Intent ............................................................................ 16

             2. Burgess's Opinions Are Flawed Because They Rely on Irrelevant "Facts" as to Which He Has No Knowledge............................................................................ 17

V.    CONCLUSION...............................................................................................18

{00712598;v1}

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aerotech Res., Inc. v. Dodson Aviation, Inc.*,
    No. 00-2099-CM, 2001 WL 474296 (D. Kan. Apr. 4, 2001) .......................................... 17

*Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*,
    No. 04 C 3271, 2005 WL 2335484 (N.D. Ill. Sept. 23, 2005)........................................ 17

*Broadcort Capital Corp. v. Summa Medical Corp.*,
    972 F.2d 1183 (10th Cir. 1992) .................................................................................. 6

*City of Hobbs v. Hartford Fire Ins. Co.*,
    162 F.3d 576 (10th Cir. 1998) .................................................................................... 6

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................................................ 5, 7

*Eaton Corp. v. Parker-Hannifin Corp.*,
    292 F. Supp. 2d 555 (D. Del. 2003).............................................................................. 5

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)........................................................................................ 5

*Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*,
    410 F. Supp. 2d 417 (W.D. Pa. 2006).......................................................................... 17

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...................................................................................... 5, 7, 9, 13

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir.1999)..................................................................................... 5, 7

*Kannankeril v. Terminix Int'l, Inc.*
    128 F.3d 802 (3d Cir. 1997)..................................................................................... 16

*Kumho Tire Co., Ltd. v. Chemical*,
    526 U.S. 137 (1999).................................................................................................. 5

*Old Line Life Insurance Company v. Brooks*, Civ.
    No. 05-722 DPJ-JCS, 2007 WL 892448 (S.D. Miss. Mar. 21, 2007) ............................ 16

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004).............................................................................. 5

*Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*,
    No. 97 C 5696, 2004 WL 783356 (N.D. Ill. Jan. 28, 2004) .......................................... 17

*Tasch, Inc. v. Sabine Offshore Serv., Inc.*,
    No. 97-15901 JAB, 1999 WL 596261 (E.D. La. 1999)................................................. 17

*U.S. v. Schiff*,
    602 F.3d 152 (3d Cir. 2010)................................................................................. 16, 18

*Watkins v. New Castle County*,
374 F. Supp. 2d 379 (D. Del. 2005) ................................................................................. 5

**Rules**

Fed. R. Civ. P. 702 ................................................................................................ 1, 2, 4, 5, 6, 16

Plaintiff PHL Variable Insurance Company ("Phoenix") files this Memorandum of Law in Support of Plaintiff's Motion to Exclude Opinions of and Testimony by Price Dawe 2006 Insurance Trust's Expert Steve C. Burgess, pursuant to Federal Rule of Evidence 702, as follows:

## I.    <u>INTRODUCTION</u>

Steve C. Burgess ("Burgess") is being offered by Defendant Price Dawe 2006 Insurance Trust, by and through its trustee, Christiana Bank & Trust ("Trust") as a purported expert in standards and practices in the life insurance industry, life insurance underwriting, and the life settlement industry. REDACTED

Burgess's opinions should be excluded. Expert opinions and testimony are admissible under Federal Rule of Evidence 702 only if they are offered by a qualified expert, reliable, and relevant. Burgess's opinions fall short of these requirements in numerous respects. First, Burgess is not qualified as an expert on underwriting, and he may not offer opinions based on such matters. Second, Burgess's opinions are not reliable because his opinions lack proper factual foundation, and he fails to employ sound methodology in reaching his conclusions. Third, Burgess's opinions are not relevant because they do not assist the fact finder in this case

The Trust bears the burden of establishing that Burgess is a qualified expert and that his opinions are both relevant and reliable. Given the many shortcomings of Burgess's report and

1

his testimony, the Trust will be unable to do so.  As such, Phoenix respectfully requests that

Burgess's opinions and testimony be excluded at trial pursuant to Federal Rule of Evidence 702.

## II.   **BACKGROUND**

### A.   **Factual Background**

This lawsuit involves the procurement of a fraudulent life insurance policy, insuring the

life of Price Jefferson Dawe (the "Policy").  (*See* Compl., [D.I. 1]).  Dawe did not procure the

Policy himself; he was merely a straw man used in a "stranger-originated life insurance"

("STOLI") scheme.  STOLI involves life insurance being procured as a mere wager on an

insured's life, as opposed to protecting the insured's family from the economic consequences of

the insured's death.  STOLI schemes violate insurable interest laws, which prohibit the use of

insurance contracts to wager on a stranger's life.  ([D.I. 37], at 16.)

Dawe was a transient with at least four aliases, no known heirs, no taxable estate, no need

for $9 million in insurance coverage, and no resources to pay premiums.  (*See* Ex. 1, Deposition

of Jonni Macdonnell ("Macdonnell Depo.") at 10:12-19; 50:25-51:22; 57:6-58:4; Ex. 2, 2007

Federal Return at PHL/DAWE 1241.)[1]  Nevertheless, for a fee, Dawe consented to allow third

parties to procure a wagering contact on his life to be sold to stranger investor The GIII

Accumulation Trust ("GIII").  (*See* Ex. 3, Application at 1–6; Ex. 4, GIII Check I; Ex. 5, GIII

Check II.)

REDACTED

---

[1] The exhibits referenced herein are attached to the Declaration of Kendall Burr, the Affidavit of
Scott Grandmont, and the Business Records Affidavit of Inland Community Bank, all filed
concurrently herewith.

REDACTED

The broker who sold the policy, Susan Hammatt, along with her husband, helped procure the wagering contract on Dawe's life by funding the initial premium.  The insurance application submitted to Phoenix misrepresented Dawe's true meager finances (*See* Ex. 3 at 1); Dawe could not afford the premiums (Macdonnell Depo. at 57:6-58:4.)  The Hammatts, after obtaining an advance of their commissions from the brokerage general agent, funded the initial premium from a joint checking account secretly set up by Dawe and Ms. Hammatt.  (*See* Ex. 9, March 26, 2007 Check; Ex. 10, March 26, 2007 Wire Transfer; Ex. 11, March 27, 2007 Check.)  These funds were later reimbursed by GIII.  (*See* Ex. 9; Ex. 10; Ex. 11.)  REDACTED

.

Three years after this transaction, Dawe passed away.  Upon receiving suspicious claims to the Policy's death benefits, Phoenix investigated and discovered the illicit nature of the transaction and filed this lawsuit seeking a declaratory judgment that the Policy is void *ab initio* for lack of an insurable interest.  (*See* Compl., [D.I. 1]).  The Trust filed counterclaims alleging causes of action for breach of contract and bad faith against Phoenix.  (*See* Counterclaim, [D.I. 43]).

B.      **Summary of Burgess's Alleged Expertise and Opinions**

REDACTED

3

REDACTED

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Civ. P. 702.   The Third Circuit has summarized these requirements as "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233

F.3d 734, 741 (3d Cir. 2000).  The party seeking to offer the expert testimony has the burden of proving the testimony's admissibility.  *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 n. 10 (1993).  The expert must explain how and why he has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation.  *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 144 (1997); *Kumho Tire Co., Ltd. v. Chemical,* 526 U.S. 137, 152 (1999).  "Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field."  *Watkins v. New Castle County*, 374 F. Supp. 2d 379, 391 (D. Del. 2005).  Further, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).  As illustrated below, this Court should exclude the opinions and testimony of Steve Burgess because they do not meet the tests set out above, and the Trust cannot meet its burden to prove the testimony's admissibility.

## IV.     <u>ARGUMENT</u>

### A.     Burgess States Opinions on Matters for Which He is Not a Qualified Expert

In order for a witness to testify as an expert, he must be qualified.  *See* Fed. R. Civ. P. 702.  "Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field."  *Watkins*, 374 F. Supp. 2d 392–913; *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 435 (D. Del. 2004).  Indeed, a judge must be persuaded that the alleged expert has knowledge or training in an area of specialized knowledge that is beyond an ordinary juror's abilities.  *Eaton Corp. v. Parker-Hannifin Corp.*, 292 F. Supp. 2d 555, 566 (D. Del. 2003).

5

REDACTED

However, Burgess lacks the background, training, and knowledge to testify about Phoenix's underwriting of the Policy.

REDACTED

REDACTED

His sales-focused background, however, does not make him an underwriting expert.  To allow Burgess to opine on underwriting would effectively suggest that *any* insurance professional employee who interacts with an underwriting department has specialized expertise in or knowledge of the underwriting field.  *See City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) ("Though a proffered expert possesses knowledge as to a general field, the expert who lacks specific knowledge does not necessarily assist the jury.") (citing *Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992)).  To allow Burgess to stand as an expert in underwriting would

6

contravene the purpose of Rule 702 and allow Burgess, who has a tenuous connection with underwriting at best, to opine on topics for which he is not a qualified expert in this case.

**B.     Burgess's Opinions Are Not Reliable**

An expert's testimony must be grounded in the procedures and methods of science and based on more than speculation.  *Daubert,* 509 U.S. at 591.  In other words, a court must assess whether the expert's methodology underlying his testimony is valid and can be appropriately applied to the facts at issue.  *Id.* at 592–93.  In conducting that examination, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."  *Heller,* 167 F.3d at 153.

In *General Electric Company v. Joiner*, the court recognized that "conclusions and methodology are not entirely distinct from one another."  522 U.S. at 146.  Thus a court could decide that "there is simply too great an analytical gap between the data and the opinion offered."  *Id.*  Here, Burgess's opinions are connected to the existing facts of the case by Burgess's whim alone; therefore, his opinions are simply not reliable.

**1.     Burgess's Opinions Concerning Phoenix's Business Practices Lack Proper Factual Foundation, and He Fails to Employ Sound Methodology in Reaching His Conclusions**

REDACTED

7

REDACTED

Thus, in addition to not being a qualified underwriting expert, Burgess did not even have a frame of reference within which to formulate an opinion.

In addition, Burgess claims that it was Phoenix's business practice to structure its compensation to encourage the sale of policies likely to be resold.  To support this argument, Burgess points to a published list of top wage earners at various life insurance companies in the United States.  (Ex. 17, Appendix: D New York Data).  REDACTED

Indeed, *most* of the companies listed on the exhibit had more "top wager earners" listed than did Phoenix, and one had as many as 49 such employees on its list—over six times as many as did Phoenix.  Burgess, unfamiliar with most of those individuals, had no basis for characterizing the list as consisting primarily of CEOs and other top executives.  Thus, Burgess had no bases of comparison from which to opine that having WMCs on the list was out of the ordinary or indicated that Phoenix issued STOLI policies.  Merely reviewing documents and coming up with a conclusion based on a partial

understanding of the documents creates an analytical gap between the information in the documents and Burgess's opinions. *See Gen. Elec. Co.,* 522 U.S. at 146.

REDACTED

He cites to a portion of Phoenix's 2009 Annual Statement to illustrate the amount of life insurance that Phoenix sold from 2005 to 2009. (Ex. 18, 2009 Five-Year Historical Data). REDACTED

He provides no basis for his conclusions and fails to tie them back to any first-hand "experience" he has with the life settlement industry or with Phoenix's business practices that lead him to conclude that Phoenix knowingly engaged in STOLI. Numbers merely reporting an increase in sales volume in the older-age market does not reveal anything about the proportion of those increased sales that may have involved STOLI business, nor about Phoenix's knowledge thereof. Accordingly, his methodology is fatally flawed as he provides no explanation as to how his cited figures about sales volume support his conclusions about the company's knowledge or intent. *See id.*

In opining that it was Phoenix's business practice to incentivize issuing policies that would be likely to be resold, Burgess relied heavily on cherry-picked testimony from depositions offered in *other* cases by two Phoenix ex-employees, Ed Humphrey and James "Max" Labar. Their hearsay testimony will not be admissible here, and while Burgess may in theory be allowed to take such inadmissible evidence into account, the evidence reflects that he employed no reliable methodology in determining which portions of their testimony was credible, if any.

REDACTED

9

REDACTED.  Labar, however, filed a lawsuit accusing Phoenix of having terminated him in retaliation because he was a "whistleblower" who had reported to state departments that other Phoenix employees were marketing life insurance policies to individuals lacking an insurable interest in the life of the insured.  *Labar v. Phoenix Life Ins. Co.*, Case No. 08-CIV-1278 (D. Ore.) D.I. 50 at ¶¶ 5, 8-11.  Importantly, the District of Oregon *granted* Phoenix's motion for summary judgment dismissing his claims.  *Labar*, Case No. 08-CIV-1278, D.I. 63. Burgess inexplicably did not consider the publicly-available testimony filed in that case, in which Labar admitted under oath that the state agencies in Oregon and California found no legal basis to take action regarding his complaints regarding STOLI.  *Labar*, Case No. 08-CIV-1278, D.I. 36-1, Exhibit 1, Labar testimony (portions of the transcript, including additional portions not attached to that filing, are attached Ex. 18) at 356:7-359:24.  Labar further admitted that he did not meet his performance obligations; in fact, when his supervisor gave him higher performance goals, he deliberately refused to submit business he could have submitted.  (*Id.* at 269:1-270:22.) Labar's testimony makes clear that he had no factual basis for his vague accusations that Phoenix sales personnel were knowingly marketing policies destined for resale to investors, as he could not identify a single case, policy, application, misrepresentation, or other evidence supporting his claims, which were based entirely on hearsay.  (*Id.* at 206:19-209:15; 221:22-223:17.)

Burgess's analysis is unreliable as it inexplicably overlooks Labar's obvious inherent bias as a terminated ex-employee seeking money from his former employer.  Indeed, Labar sought not only damages but also $750,000 in noneconomic damages from Phoenix.  (*Id.* at 120:25-121:9.)  Nor did Burgess employ any methodology whatsoever, let alone a reliable one, to analyze the credibility of Labar's testimony given that the District of Oregon, after being presented with his testimony and other evidence, dismissed Labar's claims on summary judgment.  Burgess simply drew unwarranted conclusions from portions of the transcript.

10

REDACTED

But Humphrey offered testimony contradicting that characterization.   Humphrey confirmed that he repeatedly sent emails to his producers affirmatively articulating Phoenix's position on STOLI in 2006 and 2007.  (Ex. 19, Deposition of Edward Humphrey ("Humphrey Depo.") at 302:15-303:9; 341:5-342:22; 352:1-24; 356:1-357:13.)   Humphrey's own emails repeatedly advised his producers regarding what Phoenix considered acceptable business:

- Humphrey's emails emphasized the need for "quality life insurance" that required both an insurance need and insurable interest.  (*Id.* at 303:16-304:13.)

- Humphrey's emails conveyed the company's position that "stealth non-recourse," which he defined as a "quick sale and a quick settlement," was unacceptable business to Phoenix.  (*Id.* at 341:13-343:3; 344:4-345:7.)

- Following his email regarding stealth non-recourse, he spoke directly with his producers and brokerage general agents to reiterate Phoenix's position. (*Id.* at 343: 6-21.)

- Humphrey's emails emphasized that "stealth IOLI business," meaning policies procured for the "sole purpose of selling the coverage to an investor or other disinterested third party," was unacceptable.  (*Id.* at 352:18-354:4.)

In addition to affirmatively communicating Phoenix's position on STOLI, Humphrey also made clear that he never separately told producers or agents in his region that Phoenix would accept STOLI business:

- Humphrey explicitly denied having told any producer or BGA in 2006 or 2007 that Phoenix was interest in or willing to accept policies designed for resale. (Humphrey Dep. at 197:17-198:21.)

- Humphrey denied having told any producer that selling policies for the purpose of a settlement to third-party investors was acceptable business to Phoenix.  (*Id.* at 271:7-13.)

11

- Humphrey denied having told any of his producers in 2006 or 2007 that it was "okay to issue policies where there was no intent to keep the policy or the insured didn't want or need the policy at the time of application." (*Id.* at 227:18-228:4.)

- Humphrey denied telling any producer in 2006 or 2007 that "quality life insurance for Phoenix did not require insurance need or insurable interest." (*Id.* at 304:24-305:11.)

- Humphrey denied having told any of his producers that Phoenix would accept a policy if the insured was given a financial inducement by a third party. (*Id.* at 226:5-227:13.)

- Humphrey confirmed that he did *not*, as alleged in the case in which he was deposed, tell two agents, Steven Lockwood and Marvin Meyer, that Phoenix would accept STOLI business anyway. To the contrary, he testified that Lockwood confirmed to him that he was not involved in such business, and that Meyer said he was "insulted by the question." (*Id.* at 343:6-344:3.)

- Humphrey could not identify a single other Phoenix Wealth Management Consultant as having ever told producers or agents that Phoenix would be willing to issue STOLI business. (*Id.* at 198:22-206:6.)

This testimony shows that even Humphrey, whose testimony forms the basis of Burgess's supposed expertise on Phoenix's desire for STOLI, conceded that Phoenix's position on STOLI was made very clear to producers and agents, and not just for public show. Burgess did not mention these communications or denials in his report, and offers no explanation as to how he could have reliably relied on Humphrey's testimony for only those portions he deemed supportive of his analysis and yet inexplicably ignored those portions that undermined his analysis. As such, the Court should exclude Burgess's purported opinions about Phoenix's business practices, as they are based on flawed methodology and poor factual foundation.

> **2.  Burgess's Opinions Concerning the Legitimacy of the Insurance Transaction Lack Proper Factual Foundation, and He Fails to Employ Sound Methodology in Reaching His Conclusions**

REDACTED

REDACTED

The relevant inquiry, however, has nothing to do with whether Phoenix or other insurers were turning a blind eye to issuing STOLI business, even if that were true.  Such accusations about industry practices are unrelated to the legitimacy of the Dawe transaction itself.  As framed by the Delaware Supreme Court, the legitimacy of the transaction depends entirely on the facts that relate to whether the Policy was procured in good faith for legitimate insurance purposes or if it was procured as a "mere cover for a wager."  D.I. 37 at 27.  Whether or not such wagering contracts might have been accepted by Phoenix or others in the industry is irrelevant to the inquiry.  In other words, Burgess's methodology—comparing the activities of Dawe, PVA, the Hammatts, and GIII with what he considers to be "common" in the industry—does not go to the heart of the issue.  Rather, opinions as to the transactions legitimacy would require an analysis of whether what Dawe, PVA, the Hammatts, and GIII did resulted in an insurance contract with insurable interest, or a pure wager on Dawe's life.  *Id.*  Burgess's opinions and testimony regarding the insurance transaction, therefore, fails to analyze the Policy's procurement with the proper frame of reference, and therefore, there is an analytical gap between his testimony and his ultimate conclusion.  *See Gen. Elec. Co.,* 522 U.S. at 146.

Burgess's opinions related to the legitimacy of the procurement of the Policy are also flawed because Burgess did not analyze the transaction in its entirety in offering his opinions.

REDACTED

13

REDACTED

Indeed, analyzing the purpose for insurance is crucial to a legitimate insurance transaction. REDACTED

The use of this fraud concealed the illegitimate nature of the transaction from Phoenix, and misled Phoenix in representing that Dawe would pay premiums himself, so Burgess's choice to ignore that aspect of the transaction is convenient.  Additionally, Burgess's reports do not discuss the GIII Origination Agreement, the other parties involved in the transaction, their involvement, or attempt to explain how or why Dawe established a trust to host the Policy.

REDACTED

with Dawe is its beneficiary; because the death benefit would have become part of his taxable estate upon his death, the arrangement made no sense as an estate planning tool, thus suggesting that the transaction was designed for purposes of transfer rather than estate planning. REDACTED

(*Id.*).  Tellingly,

14

however, none of his listed examples involve what we have here, an irrevocable trust holding life insurance with a revocable trust as its beneficiary. 

In sum, Burgess's reports contain only the information that is favorable to the Trust and its position, ignores the facts and documents that contradict his own conclusions, and employs flawed methodologies in interpreting the significance of facts suggesting that the transaction was set up for the purpose of a transfer. Burgess's flawed methodology, which includes using cherry-picked facts, incorrect analogies, and misconstrued testimony, does not support his opinions, which should therefore be excluded.

15

### C.     Burgess's Opinions Do Not Assist the Trier of Fact

Rule 702 requires that an expert may testify only if there is sufficient "fit"—his expertise "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Civ. P. 702; *see U.S. v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (discussing the third requirement to Rule 702).   "Put another way, this is a question of relevance, and 'Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility' if it has the 'potential for assisting the trier of fact.' *Schiff*, 602 F.3d at 173 (citing *Kannankeril v. Terminix Int'l, Inc.* 128 F.3d 802, 806 (3d Cir. 1997) (citation omitted).  Burgess's opinions are not relevant because they involve questions of law that are for the Court alone to decide, involve facts that have no bearing to the issues in this case, and invade the province of the fact finder.  Thus, the opinion and testimony must be excluded.

### 1.     Burgess's Phoenix's Business Practices Opinions Improperly Opine as to Phoenix's Analysis and Intent

REDACTED

Such opinions will not "assist the trier of fact to understand the evidence" (Fed. R. Civ. P. 702), as Burgess has no expertise in matters relevant to interpreting what Phoenix intended.  Indeed, Burgess's "opinions" on this topic or nothing more than pure speculation.

The Trust's other expert in this case, William D. Hager, had his expert opinions excluded in another case for this very reason.  In *Old Line Life Insurance Company v. Brooks*, Civ. No. 05-722 DPJ-JCS, 2007 WL 892448 (S.D. Miss. Mar. 21, 2007), the Court found that Hager

16

"possesse[d] no specialized knowledge that places him in a position to assist the jury in determining what [the insured] was thinking." *Id.* at *9 (citing *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 423 (W.D. Pa. 2006) ("An expert simply is not in any better position than the [factfinder] to assess another's subjective intent."); *Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*, No. 04 C 3271, 2005 WL 2335484, *4 (N.D. Ill. Sept. 23, 2005) (party's intent is within province of the finder of fact); *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, No. 97 C 5696, 2004 WL 783356, at *6 (N.D. Ill. Jan. 28, 2004) (same); *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, No. 00-2099-CM, 2001 WL 474296, at *2 (D. Kan. Apr. 4, 2001) (striking expert's testimony regarding parties'' intent in entering into a contract); *Tasch, Inc. v. Sabine Offshore Serv., Inc.*, No. 97-15901 JAB, 1999 WL 596261 (E.D. La. 1999) (same). Thus, to the extent that Burgess seeks to use documents to opine as to what Phoenix *intended*, his testimony and report should be excluded as unhelpful to this Court as the trier of fact.

**2.    Burgess's Opinions Are Flawed Because They Rely on Irrelevant "Facts" as to Which He Has No Knowledge**

REDACTED

Burgess simply points to a Phoenix Life Solutions document, which he had never seen before this case, and provides an overly broad "expert opinion" on Phoenix's financial motives.

17

Burgess's conclusions regarding Phoenix Life Solutions are unhelpful, are not based on any specialized insight, and are ultimately irrelevant because they will not assist the trier of fact.  *See Schiff*, 602 F.3d at 173.

### V.   CONCLUSION

For the reasons stated above, Plaintiff PHL Variable Insurance Company respectfully requests that the Court grant this Motion and exclude any and all opinions and testimony by Steve C. Burgess from being admitted at trial.  Phoenix further requests that the Court grant such other and further relief to which Phoenix may be justly entitled.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Richard D. Heins (I.D. #3000)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
rheins@ashby-geddes.com
tlydon@ashby-geddes.com

-and-

Thomas F.A. Hetherington
Jarrett E. Ganer
Kendall Burr
EDISON, McDOWELL &
    HETHERINGTON LLP
Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
(713) 337-5580

*Attorneys for Plaintiff*
*PHL Variable Insurance Company*

Dated:  January 22, 2013

18